DA 09-0123

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 379N

IN RE THE MARRIAGE OF
SHARON KAY SNELL,

Petitioner and Appellant,

v.

ROBERT S. SNELL,

Respondent and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DR-1999-203(A)
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Judith A. Loring, Attorney at Law, Stevensville, Montana

For Appellee:

Bruce McEvoy, Kai Groenke, Johnson, Berg, McEvoy & Bostock, PLLP,
Kalispell, Montana

Submitted on Briefs:  October 8, 2009

Decided:  November 10, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d)(v), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, the following memorandum decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Robert (Robert) and Sharon (Sharon) Snell were divorced in August 2001 after 34 years of marriage, much of which was spent farming several properties acquired during the marriage. Sharon appealed the marital asset division set forth in the Decree and we affirmed the Decree in November 2002. *In re the Marriage of Snell,* 2002 MT 243N, 313 Mont. 420, 63 P.3d 512 ("*Snell I*"). Implementation of the Decree, however, proved difficult and after multiple post-appeal issues were raised, the District Court held a hearing on September 25 and 26, 2008, to address and resolve these issues. In February 2009, the District Court issued its Findings of Fact, Conclusions of Law and Order (Order). Sharon appeals this Order, raising 9 issues. We affirm.

**ISSUES**

¶3 Sharon raises the following issues on appeal:

¶4 Did the District Court err when it denied Sharon her basic rights?

¶5 Did the District Court err when it found there was no farming partnership between the parties?

¶6 Did the District Court err when it found that surveys had been completed?

2

¶7    Did the District Court err when it modified the Final Decree to require Sharon to pay to drill a well?

¶8    Did the District Court err when it found Robert's mathematical "methodology" to be accurate?

¶9    Did the District Court err when it found that Sharon had been reimbursed for payment on the Bjornrud Escrow?

¶10    Did the District Court err when it found Robert did not fail to disclose assets?

¶11    Did the District Court err when it determined the date of division of retirement accounts?

¶12    Should the District Court have excused [sic] itself?

¶13    In her Reply Brief, Sharon asserts that Robert's Response Brief does not conform to the Rules of Appellate Procedure and should be stricken or ignored.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶14    As noted above, Robert and Sharon farmed on several parcels of property acquired during their marriage. Upon dissolution, they both expressed to the District Court that they wished to continue farming; therefore the District Court attempted to equitably divide the numerous property holdings in a manner allowing the parties to continue farming on land allocated to each of them individually. While most of the properties were able to be distributed in their entirety to either Robert or Sharon, two parcels—the Creston Farm and the Snell Home Place—required division with each party getting a portion of the property. As a result of divided ownership of these 2 parcels, the court required the properties to be surveyed to enable an accurate division.

3

¶15 One of the properties allocated in its entirety to Sharon was a 5-acre parcel along Lake Blaine that the District Court valued at $276,000. The lake was the source of irrigation water that serviced the entire Snell Home Place and the water pump was located on the Lake Blaine parcel. While the court gave the real property to Sharon, it granted a water use right and easement to both parties to enable both Robert and Sharon to irrigate their portions of the Snell Home Place farmland.

¶16 In post-appeal proceedings, Robert moved for the court's assistance in implementing the terms of the Decree. He alleged that Sharon was uncooperative and was not complying with the court's previous order that the parties retain a surveyor to conduct surveys of the Creston Farm and the Snell Home Place. The parties continued to accuse, counter-accuse, and generally disagree on multiple issues leading the District Court to issue an order on March 23, 2005, ordering them to specifically complete the previously-ordered surveys of the Creston Farm and Snell Home Place properties and, upon completion of the surveys, to execute and deliver, or place in escrow, specific documents memorializing the court-ordered transfer of these properties. The court deferred ruling on the Lake Blaine water pump issue until the surveys and land transfers had taken place. Sharon promptly appealed this order to this Court. We dismissed her appeal without prejudice on the ground that she was seeking to appeal an interlocutory, as opposed to a final, order, and such appeal was not authorized by the Rules of Appellate Procedure. M. R. App. P. 4 (2007).

¶17 Robert subsequently executed the necessary grant deeds and delivered them to Sharon. However, by March 2008, Sharon had not done the same; therefore, Robert

4

sought a citation of contempt and an order to show cause. A show cause hearing was held on May 20, 2008, followed by a 2-day evidentiary hearing on September 25-26, 2008. The District Court heard extensive testimony and was presented with numerous exhibits at the September hearing. It issued its Order on February 10, 2009. It also signed 3 orders transferring real property interests from Robert to Sharon, and 3 orders transferring real property interests from Sharon to Robert. In its February 10 Order, the court set forth 43 detailed findings of fact, 2 conclusions of law and 6 orders/judgments. Sharon appeals 22 findings and the legal conclusions based upon them.

## STANDARD OF REVIEW

¶18 We review a district court's findings of fact to determine if they are clearly erroneous and its conclusions of law for correctness. *Monroe v. Marsden*, 2009 MT 137, ¶ 20, 350 Mont. 327, 207 P.3d 320 (citation omitted).

## DISCUSSION

¶19 *Did the District Court err when it denied Sharon her basic rights?*

¶20 Sharon devotes a large percentage of her Appellant's Brief to the argument that the District Court denied her various basic rights, including, (1) the right to basic necessities, (2) the right to equal protection under the law, (3) the right to a speedy trial, and (4) the right to not be deprived of her property without due process. Her arguments primarily consist of complaints against District Court actions, or inactions, dating back to 2001—i.e., perceived slights by the court in hearings, failure of the court to require certain actions by Robert, and the court's attempt to "dodge" issues she raised, among others. While Sharon may be dissatisfied with the manner in which the District Court

conducted this almost decade-long proceeding, the record does not reveal that Sharon was deprived of basic rights. The lengthy evidentiary hearing transcript reveals that the District Court allowed Sharon to offer detailed testimony on the issues and present the evidence she considered relevant over a continuing relevancy objection by Robert. The orders issued by the District Court throughout the proceeding appear to be carefully considered and fairly judged. Moreover, Sharon identifies nothing in the February 2009 Order that supports her argument of deprived basic rights. For these reasons, Sharon's claim of deprivation of rights appears to be without merit.

¶21 *Did the District Court err when it found there was no farming partnership between the parties?*

¶22 The District Court did not err when it found that no farming partnership existed between the parties. The record supports this finding, as there was no convincing evidence of the existence of a business partnership. Furthermore, neither party made express assertions of the existence of a partnership at the time of the dissolution hearing. While Sharon claims she then presented evidence making the existence of a partnership obvious, had this been a legal theory upon which she wished to rely when the parties' property was originally divided, she should have *expressly and plainly* presented the issue for resolution. She did not. Her post-Decree and post-appeal assertion of the existence of a farming partnership and evidence purporting to support the assertion— evidence that was available at the time of the dissolution hearing—comes too late. It is well established that we will not put a district court in error for not doing what it was not

6

asked to do. As the issue of the existence of a business partnership is raised for the first time well after the parties' property was divided, we decline to consider it.

¶23 *Did the District Court err when it found that surveys had been completed?*

¶24 Sharon argues that because Robert did not seek to admit the actual surveys into the District Court record,[1] the court's finding that the surveys were conducted is erroneous. She claims she was never permitted to review the surveys to determine their correctness. This argument is unpersuasive for several reasons. First, Sharon never objected to Robert's failure to offer the surveys. There was substantial testimony at the hearing about the surveys and that the property descriptions had been revised accordingly. Robert even offered the surveyor's bill for the surveys as evidence and Sharon did not object to either the bill or the absence of the surveys. Moreover, the purpose of the surveys was to get a corrected property description to allow for the transfer of deeds of the surveyed property. Sharon does not dispute that she received the deeds to the property that contained the descriptions developed by the surveys, nor does she dispute the correctness of the legal description. The record contained credible evidence that the surveys were performed, such as an explanatory letter from the surveyor.

¶25 For these reasons, the District Court's findings pertaining to the real property surveys are factually supported by the record, and are not clearly erroneous.

¶26 *Did the District Court err when it modified the Final Decree to require Sharon to pay to drill a well?*

---

[1] The surveys were recorded with the Clerk and Recorder for Flathead County.

¶27 The Decree allocated the Lake Blaine property to Sharon and valued the property at $276,000. The Decree allocated the "farm equipment and tools" to Robert. Neither the court nor the parties or their attorneys noticed that ownership of the water pump located on the Lake Blaine property had not been allocated.

¶28 Upon remand of the case to the District Court for resolution of post-Decree and post-appeal issues, Sharon asserted that the pump was a fixture that ran with her property. She opined that the $276,000 value the District Court had attributed to the Lake Blaine parcel could be achieved only by removal of the irrigation system, including the pump and pump house. She stated that an appraiser concluded that the presence of the pump, its associated housing and pipelines, and easements diminished the value of the property to between $85,000 and $150,000. She opined that if Robert wanted to continue to irrigate from the lake, he could install another pump elsewhere.

¶29 Robert subsequently suggested that Sharon be allowed to remove the water pump, pump house and water lines from the Lake Blaine property and enjoy the enhanced property value. Robert agreed to relinquish any interest he may have in the pump as well as his water easement rights across Sharon's properties (Lake Blaine and Snell Home Place) in return for Sharon paying him $35,000 to be used toward the cost of installing a well on his property to continue irrigating his farm land. He opined that this $35,000 was substantially less than the enhanced value Sharon would recognize to both her Lake Blaine and Snell Home Place property once the irrigation system was removed.

¶30 The District Court found that "it would be impossible for the parties to jointly own and cooperate in the operation of an irrigation system" and that the "fair and equitable

resolution" is to require Sharon to pay Robert $35,000 for the installation of another water well on his portion of the Snell Home Place for his farming use. Sharon argues that this constitutes a modification of the original Decree for which the District Court does not have jurisdiction.

¶31 We disagree with Sharon. The matter of the value of the Lake Blaine property with and without the irrigation system constituted a new matter which the court was required to resolve post-Decree and post-appeal, especially in light of the fact that the court had previously failed in the original Decree to allocate ownership of the water pump on the property. The Court fashioned a reasonable remedy, taking into account the arguments and evidence of both parties. We conclude the District Court did not err in doing so, nor did it exceed its jurisdiction in making such findings based on new evidence and information.

¶32 *Did the District Court err when it found Robert's mathematical "methodology" to be accurate?*

¶33 Sharon argues that the District Court erred when it adopted Robert's mathematical method for determining the amount of government payments Sharon should have received based on the allocation of farm proceeds in the Decree. Sharon argues she should have continued receiving 50% of the income until this case has reached final resolution and Robert argues that the Decree's allocation of farm income is in effect and Sharon should be paid accordingly. A U.S. Department of Agriculture (USDA) representative, at Robert's behest, recalculated the government payments based on the Decree's allocation and indicated the overpayments made to Sharon since 2001. The

9

District Court therefore ordered Sharon to reimburse Robert for these overpayments. We conclude the District Court did not err by relying on the evidence presented in letters by the USDA and Robert that supported a distribution of government payments in accordance with the terms of the Decree.

¶34  *Did the District Court err when it found that Sharon had been reimbursed for payment on the Bjornrud Escrow?*

¶35  Sharon established that she paid off a $21,000 debt owed to Robert's mother, Betty Bjornrud. She claimed that all the farm land was encumbered by this debt and she was afraid Bjornrud would foreclose on all land secured by the debt if she did not pay it. She testified that she did not recall whether Robert had repaid her or not. Robert, on the other hand, testified as to the check numbers, the dates, and the amounts of the two checks he had delivered to Sharon to reimburse her for payment of this debt. The District Court, therefore, was presented with conflicting evidence as to this issue. It is the district court's role, not this Court's, to weigh and resolve conflicts in the evidence and to judge the credibility of witnesses. *State v. Hurlbert*, 2009 MT 221, ¶ 40, 351 Mont. 316, 211 P.3d 869. The District Court did so and issued a finding that was supported by credible evidence. The court's finding is not clearly erroneous.

¶36  *Did the District Court err when it found Robert did not fail to disclose assets?*

¶37  The record supports the District Court's finding that at the time of dissolution, the court allocated all existing assets and debts and there were no allegations of non-disclosure at that time. It acknowledged that farming was an on-going operation that generated income and debt after the Decree had been entered, and that it allocated those

assets, debts and income accordingly. Based on the record, this finding is not clearly erroneous.

¶38 *Did the District Court err when it determined the date of division of retirement accounts?*

¶39 Sharon opines that the District Court erred when it divided Robert's pension accounts based upon the date the parties separated rather than the date "the pensions themselves are separated." She claims the language in the Decree pertaining to this issue is ambiguous. The District Court clearly stated in the Decree that the parties had agreed that each should receive one-half of Robert's accumulated retirement benefits through his employment at Columbia Falls Aluminum Company, and its predecessors, as of the date of their separation. This Decree finding was upheld on appeal by this Court in *Snell I*. The court did not err by so finding in its February 2009 Order.

¶40 *Should the District Court have excused [sic] itself?*

¶41 We decline to address this issue as we conclude, based on the record, it is without merit.

¶42 In her Reply Brief, Sharon alleges that Robert's response brief does not conform to the Rules of Appellate Procedure and should be stricken or ignored. She claims that Robert's brief fails to reference citations to the record. This argument is without merit. We require substantial compliance with the Rules of Appellate Procedure and Robert's brief satisfies this standard.

¶43 It is appropriate to decide this case pursuant to Section I, Paragraph 3(d)(i) of our 1996 Internal Operating Rules, as amended in 2006, which provides for memorandum

11

opinions. It is manifest on the face of the briefs and the record before us that the appeal is without merit because the factual findings are supported by substantial credible evidence and are not clearly erroneous. Moreover, the legal issues are controlled by settled Montana law and are not incorrect.

## CONCLUSION

¶44 For the foregoing reasons, we affirm the District Court.


/S/ PATRICIA O. COTTER

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE